**21 MAG 9162**

Approved: _____
KIERSTEN A. FLETCHER
Assistant United States Attorney

Before:   HONORABLE JAMES L. COTT
United States Magistrate Judge
Southern District of New York

- - - - - - - - - - - - - - - x
                                :   **<u>SEALED COMPLAINT</u>**
UNITED STATES OF AMERICA        :
                                :   Violations of 15 U.S.C.
        - v. -                  :   §§ 78j(b), 78ff, 80a-3,
                                :   80a-17, 80a-48; 17 C.F.R.
SERGEI POLEVIKOV,               :   §§ 240.10b-5 & 270.17j-1;
                                :   18 U.S.C. §§ 1343 & 2.
            Defendant.          :
                                :   COUNTY OF OFFENSE:
                                :   New York
                                :
- - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

THOMAS McDONALD, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation ("FBI") and charges as follows:

<u>COUNT ONE</u>
**(Securities Fraud)**

1. From at least in or about January 2014 through at least in or about October 2019, in the Southern District of New York and elsewhere, SERGEI POLEVIKOV, the defendant, willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, the mails and the facilities of national securities exchanges, used and employed manipulative and deceptive devices and contrivances in connection with the purchase and sale of securities, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a)employing devices, schemes and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon persons, to wit, POLEVIKOV fraudulently misappropriated confidential

information from his employer, a Manhattan-based asset management firm (the "Employer Firm"), about the Employer Firm's confidential trading activity, and used that information for his own profit by making and causing profitable securities trades in accounts controlled or directed by POLEVIKOV.

(Title 15, United States Code, Sections 78j(b) & 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; Title 18, United States Code, Section 2.)

## COUNT TWO
### (Wire Fraud)

2.   From at least in or about January 2014 through at least in or about October 2019, in the Southern District of New York and elsewhere, SERGEI POLEVIKOV, the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, POLEVIKOV, including through the use of interstate and foreign wires, fraudulently misappropriated confidential information from the Employer Firm about the Employer Firm's trading activity, and used that information for his own profit by making and causing timely, profitable securities trades in accounts controlled or directed by POLEVIKOV.

(Title 18, United States Code, Sections 1343 and 2.)

## COUNT THREE
### (Investment Company Fraud)

3.   From at least in or about January 2014 through in or about October 2019, in the Southern District of New York and elsewhere, SERGEI POLEVIKOV, the defendant, acting as an access and advisory person of an investment adviser for an investment company registered under the Investment Company Act, willfully and knowingly, did fail to report to the investment adviser information regarding transactions in covered securities in which POLEVIKOV had a beneficial ownership, and information regarding broker, dealer, and bank accounts in which securities were held for the direct and indirect benefit of POLEVIKOV, to wit, POLEVIKOV falsely told the Employer Firm that he had disclosed all of his personal trading accounts and brokerage accounts in which he held a

beneficial interest, and had sought pre-approval for his personal securities trades, when, in fact, he had not.

(Title 15, United States Code, Sections 80a-3, 80a-17, 80a-48;
17 C.F.R. Section 270.17j-1; Title 18, United States Code,
Section 2.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

4. I have been a Special Agent with the FBI for approximately fourteen years. I am currently assigned to a squad that is responsible for investigating violations of the federal securities laws, as well as wire and mail fraud laws and related offenses. I have participated in numerous investigations of these offenses, and I have made and participated in making arrests of numerous individuals for committing such offenses.

5. The information contained in this affidavit is based upon my personal knowledge, as well as information obtained during this investigation, directly and indirectly, from other sources, including my review of financial records, my interviews of witnesses, and from speaking with representatives of the United States Securities and Exchange Commission (the "SEC"). Because this affidavit is being submitted for a limited purpose, I have not set forth each and every fact I have learned in connection with this investigation. Where conversations and events are referred to herein, they are related in substance and in part unless otherwise noted. Where dates, figures, and calculations are set forth herein, they are approximate.

## Overview of the Front Running Scheme

6. At all times relevant to this Complaint, SERGEI POLEVIKOV, the defendant, was employed as a quantitative analyst at an asset management firm with headquarters in New York, New York (the "Employer Firm"). In his role at the Employer Firm, POLEVIKOV had regular access to information regarding contemplated securities trades on behalf of the Employer Firm's clients. As further described below, beginning in at least in or about 2014, POLEVIKOV engaged in a front running scheme whereby POLEVIKOV committed insider trading through the misappropriation of confidential, material, non-public information about the securities trade orders of the Employer Firm on behalf of its clients. POLEVIKOV misappropriated this information in order to engage directly and indirectly in short-term personal securities trading designed to profit by executing trades that take advantage of relatively small price movements

in a company's stock that follow from large securities orders executed by the Employer Firm on behalf of its clients (the "Front Running Scheme").  In total, POLEVIKOV's participation in the Front Running Scheme yielded more than $8.5 million in illicit profits.

7.    To conceal the Front Running Scheme, and notwithstanding policies of the Employer Firm to prevent insider trading, POLEVIKOV lied to the Employer Firm about his personal trading accounts and securities trades conducted therein.

## Background on the Investment Company Act

8.    Based on my participation in this investigation, as well as the sources listed in paragraph 5 *supra*, I have learned the following, in substance and in part:

a.    Title 15, United States Code, Section 80a-3 defines the term "investment company" as used in the Investment Company Act of 1940 to mean, in substance and in part, a company "engaged primarily . . . in the business of investing, reinvesting, or trading in securities."

b.    Title 15, United States Code, Section 80a-2 defines the term "investment adviser" as used in the Investment Company Act of 1940 to mean, in substance and in part, "any person . . . who pursuant to contract with [an investment] company regularly furnishes advice to such company with respect to the desireability of investing in, purchasing or selling securities or other property, or is empowered to determine what securities or other property shall be purchased or sold by such company."

c.    Rule 17j-1 under the Investment Company Act, 17 C.F.R. § 270.17j-1, requires, as relevant here, that every "Access Person" of an investment advisor of an investment company report to the investment advisor on a periodic basis information regarding any transaction during the covered period in any security in which the Access Person had any direct or indirect beneficial ownership, and information regarding any account established by the Access Person in which any securities were held during the period of the report for the direct or indirect benefit of the access person. See 17 C.F.R. § 270.17j-1(d). Rule 17j-1 defines "Access Person" to include any "Advisory Person" of an investment advisor, and defines "Advisory Person," in turn, to include, as relevant here, "any . . . employee . . . who, in connection with his or her regular functions or duties . . . obtains information regarding

the purchase or sale" of securities by an investment company.  17
C.F.R. § 270.17j-1(a)(1) and (a)(2).

9.    At all times relevant to this Complaint, the Employer
Firm was an investment adviser registered with the SEC that acted
as investment adviser to several client funds (the "Funds") that
qualify as investment companies under the Investment Company Act.
POLEVIKOV's access to information about the Employer Firm's
contemplated trades on behalf of the Funds qualified him as
an access person and advisory person subject to Rule 17j-1 of the
Investment Company Act.

### The Fraudulent Scheme

### The Illicit Front Running Trading

10.   As part of my investigation, I have reviewed trading
records for the Employer Firm, trading records related to a
brokerage account held in the name of the wife of SERGEI POLEVIKOV,
the defendant, (the "Subject Account") as well as an analysis of
these trading records conducted by the SEC (the "Trading
Analysis").

11.   Based on my review of the trading records and the Trading
Analysis, I have learned that since at least in or about 2014, the
Subject Account has generated millions of dollars in profits and
that a substantial portion of those profits are attributable to
the Front Running Scheme.  In particular, I have observed a
repeated pattern of short-term intraday trading in the Subject
Account as follows: (i) the Employer Firm enters an order into its
internal order management system to purchase (or sell) shares in
a public company; (ii) the Subject Account buys (or short sells[1])
shares in the same public company, generally in the same direction
as the Employer Firm; and (iii) the Employer Firm begins executing
the purchases (or sales) of shares in the order book in quantities
that are far larger than the amount of shares bought (or short
sold) by the Subject Account.  This trading by the Employer Firm
leads to a slight, temporary movement in the price of the relevant
company's stock during and after the window that the Employer Firm
is executing its trades (the "Window"); namely, the stock price
will tend to rise slightly if the Employer Firm is buying
(consistent with the increased demand hitting the market), and the

---

[1] Short selling is a method of trading designed to benefit from
the decrease in the price of a stock whereby a trader borrows
shares to sell in the market while agreeing to subsequently
purchase shares to repay or "cover" the loan.

stock price will tend to drop slightly if the Employer Firm is selling (consistent with the increased supply hitting the market); (iv) during or shortly after the Window, the Subject Account liquidates its position by selling (or buying to cover the short) shares in the company at the temporary inflated (or deflated) price created by the pressure of the Employer Firm's executions.

    a.    By way of example, after the close of trading on Friday, January 19, 2018, the Employer Firm entered a large order to buy shares of stock in Itau Unibanco ("ITUB"), whose American Depositary Receipts ("ADRs") trade on the New York Stock Exchange. On or about January 22, 2018, before the Employer Firm's ITUB order was fully executed, the Subject Account purchased approximately 400,000 shares in ITUB.  The Employer Firm executed its order to buy ITUB over the course of the day on January 22, 2018 and, during that time, purchased nearly 8 million shares of ITUB, which caused ITUB's share price to increase slightly.  While those purchases by the Employer Firm were being executed, the Subject Account sold all of the approximately 400,000 ITUB shares for approximately $96,358 in profits.

    b.    By way of further example, on or about August 28, 2019, at approximately 12:12 p.m. EST, the Employer Firm entered a large order to sell stock in a public company called Philip Morris International, Inc. ("PM"), whose stock trades on the New York Stock Exchange.  Then, beginning at approximately 12:15 p.m., the Subject Account sold short approximately 31,000 shares of PM. The Employer Firm sold more than 800,000 shares of PM over the course of the afternoon and, during that time, caused PM's share price to decrease slightly.  After the trades by the Employer Firm were executed, the Subject Account that had short sold the shares of PM purchased enough shares to cover its short position for approximately $35,000 in profits.

    c.    To date, the Trading Analysis has revealed approximately 2,800 specific instances of trading in the Subject Account in this pattern between in or about 2014 and in or about October 2019, yielding a total of over $8.5 million in trading profits.  In addition, while the Subject Account also includes other profitable trading activity, including some activity that does not involve same day purchases and sales of securities, and some trading activity that does not overlap with trading by the Employer Firm, the Trading Analysis has revealed that more than 92% of short term trades made in in the Subject Account overlapped with trades executed by the Employer firm and, of those trades, more than 99% were trades in the same security and in the same direction as trades by the Employer Firm.

<u>POLEVIKOV Controlled the Subject Account</u>

12.  Based upon my participation in this investigation, including my review of bank records and brokerage account records showing the IP addresses used to log in to the Subject Account, as well as records provided by the Employer Firm related to IP addresses used by the Employer Firm, I have learned that SERGEI POLEVIKOV, the defendant, engaged in the Front Running Scheme trading in the Subject Account, and maintained a beneficial ownersip in the Subject Account.  Specifically, I have learned, among other things, the following:

a.  The Subject Account was opened in or about 2011 in the name of POLEVIKOV's wife.  The first approximately 42 logins to the Subject Account occurred using IP addresses maintained by the Employer Firm.  POLEVIKOV's wife does not and has never worked at the Employer Firm.

b.  On or about January 22, 2018, that is, the date of the ITUB trades described in paragraph 11(a) *supra*, the Subject Account was accessed from an IP address in London, United Kingdom. Based upon my review of travel records for POLEVIKOV, as well as for POLEVIKOV's wife, I have learned that POLEVIKOV traveled to London, United Kingdom on or about January 20, 2018, and returned to the United States on or about January 23, 2018.  POLEVIKOV's wife did not travel to London during this time.

c.  On or about August 28, 2019, that is, the date of the PM trades described in paragraph 11(b) *supra*, the Subject Account was accessed from an IP address maintained by the Employer Firm.

d.  As part of my participation in this investigation, I have identified Citibank accounts ending in -0885 (the "0885 Account") and -0906 (the "0906 Account").  Based upon my review of records in the 0885 Account and 0906 Account, I have learned that the 0885 Account is an account jointly held by POLEVIKOV and his wife, and the 0906 Account is an account held solely by POLEVIKOV.

e.  Between in or about 2011 and in or about December 2019, the Subject Account transferred approximately $9.2 million representing the proceeds from securities trades in the Subject Account to the 0885 Account.  Such transfers were commonly followed by transfers of funds from the 0885 Account to the 0906 Account. For example, the 0885 Account received transfers of $10,000 each on several occasions in December 2015 and January 2016, which were subsequently transferred to POLEVIKOV's 0906 Account, as set forth below:

| Date | Transfers from Subject Account to 0885 Account | Transfer from 0885 Account to 0906 Account |
|---|---|---|
| 12/2/2014 | $10,000.00 | |
| 12/15/2014 | $10,000.00 | |
| 12/18/2014 | $10,000.00 | |
| 12/19/2014 | | $10,000.00 |
| 12/22/2014 | $10,000.00 | |
| 12/22/2014 | | $10,000.00 |
| 1/2/2015 | | $10,000.00 |
| 1/7/2015 | $10,000.00 | |
| 1/13/2015 | $10,000.00 | |
| 1/13/2015 | | $10,000.00 |
| 1/15/2015 | $10,000.00 | |
| 2/2/2015 | | $10,000.00 |
| 2/13/2015 | | $10,000.00 |
| 2/17/2015 | | $10,000.00 |
| 2/17/2015 | | $10,000.00 |
| 2/17/2015 | | $10,000.00 |
| 2/25/2015 | | $10,000.00 |

f.  As further example, following the ITUB trades described in paragraph 11(a) supra, the Subject Account made the following transfers of cash to the 0885 Account, immediately followed by transfers to POLEVIKOV's 0906 Account, as set forth below:

| Date | Transfers from Subject Account to 0885 Account | Transfer from 0885 Account to 0906 Account |
|---|---|---|
| 1/30/2018 | $10,000.00 | |
| 2/1/2018 | $10,000.00 | |
| 2/1/2018 | | $10,000.00 |
| 2/6/2018 | $10,000.00 | |
| 2/6/2018 | | $10,000.00 |
| 2/7/2018 | $10,000.00 | |
| 2/7/2018 | | $10,000.00 |
| 2/8/2018 | $10,000.00 | |
| 2/8/2018 | | $10,000.00 |
| 2/9/2018 | $10,000.00 | |
| 2/9/2018 | | $10,000.00 |
| 2/12/2018 | | $10,000.00 |

g.  In other words, after liquidating securities in the Subject Account as part of the Front Running Scheme, POLEVIKOV transferred the proceeds of the Front Running Scheme to an account

jointly held with his wife before, on many occasions, immediately transferring the proceeds to an account controlled solely by himself, demonstrating POLEVIKOV's beneficial interest in the Subject Account.

<u>POLEVIKOV Concealed the Subject Account from the Employer Firm</u>

13.   Based on my participation in this investigation, as well as the sources listed in paragraph 5 *supra*, and my review of material provided by the Employer Firm, I know that the Employer Firm requires its employees to keep information about, among other things, securities trade orders and executions made by the Employer Firm on behalf of its clients strictly confidential.  I also know that the Employer Firm has prohibitions and safeguards designed to prevent its employees from using that information for any purpose outside the scope of their employment, including prohibitions concerning confidentiality, personal trading, and insider trading.

a.   In particular, during the relevant time period, the Employer Firm had in place a code of ethics (the "Code of Ethics") "in compliance with Rule 17j-1 under the Investment Company Act of 1940" to ensure "the detection and prevention of activities by which persons having knowledge of the . . . recommended investments and investment intentions of [the Employer Firm] . . . may abuse their fiduciary duties."  The Code of Ethics further provided, in relevant part, that "no Employee may purchase or sell a security for his or her personal account with actual knowledge that an order to buy or sell the same security has been made … or is being considered" for the Employer Firm's clients.  The Code of Ethics further required employees to disclose to the Employer Firm any personal trading accounts, any ownership of securities, and to obtain pre-approval for any proposed personal securities trades with the Employer Firm before trading.

b.   When SERGEI POLEVIKOV, the defendant, was hired by the Employer Firm in or about April 2004, the Employer Firm informed POLEVIKOV in writing of the Code of Ethics and restrictions on personal trading by employees.  By letter dated April 1, 2004, the Employer Firm informed POLEVIKOV, in substance and in part, that the Employer Firm was "an investment advisor registered with the SEC" and that, as a result, was required to "monitor and regulate the personal securities transactions of employees who have access to information about portfolio securities held by the funds" managed by the Employer Firm.  It further notified POLEVIKOV of his obligation, pursuant to Rule 17j-1 under the Investment Company Act, to disclose his personal securities holdings, and certify his receipt of and compliance with the Employer Firm's Code of Ethics.

c.   On or about April 19, 2004, POLEVIKOV signed a certification affirming that he was subject to the Code of Ethics, that he had complied with the Code of Ethics, and that he had "disclosed or reported all personal securities transactions and holdings as required under the Code of Ethics."   POLEVIKOV submitted similar certifications annually through 2019.

d.   For example, on or about January 16, 2014, POLEVIKOV certified, in relevant part, that he had "(i) received the Code of Ethics; (ii) . . . read and underst[ood] the Code; (iii) . . . complied with the Code including each of the specific practices, policies and procedures discussed or referred to in the Code; [and](iv)[understood he was] subject to the applicable requirements under the Code."   POLEVIKOV submitted the same or similar certifications each year through 2019.

e.   Based upon my review of records maintained by the Employer Firm, I have learned that between in or about June 2014 and in or about October 2019, POLEVIKOV sought and received pre-clearance from the Employer Firm to trade securities in his personal brokerage accounts on more than 700 occasions, and received approval from the Employer Firm to execute trades in accounts he maintained at multiple broker-dealers.

f.   As set forth in paragraph 12 *supra*, POLEVIKOV had a direct beneficial ownership in the Subject Account and used the Subject Account to perpetrate the Front Running Scheme. Notwithstanding his familiarity with the policies described above, and notwithstanding his beneficial interest in the Subject Account, POLEVIKOV concealed the Front Running Scheme by failing to disclose the Subject Account to the Employer Firm, despite disclosing other trading accounts in which he had a beneficial interest.   POLEVIKOV also failed to seek or obtain pre-approval to execute any securities trades in the Subject Account or to report the trades after they occurred, in violation of both the Employer Firm's Code of Ethics and Rule 17j-1 of the Investment Company Act.

WHEREFORE, I respectfully request that an arrest warrant be issued for SERGEI POLEVIKOV, the defendant, and that he be arrested and imprisoned or bailed, as the case may be.

/s/ Thomas McDonald with permission
THOMAS McDONALD
SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION

Sworn to me through the transmission
of this Complaint by reliable electronic means
pursuant to Federal Rule of Criminal Procedure 4.1,
this 21th day of September, 2021

JAMES L. COTT
United States Magistrate Judge

11